This is appeal number 192209-193408. United States v. Robert Nieto. And Ms. Schmidt, are you going first? Yes, Your Honor. Oh. Anytime you are ready. Thank you, Your Honor. And may it please the Court, Leslie Schmidt, on behalf of Appellant Robert Nieto. I plan to address the issues raised in Mr. Nieto's brief, and Ms. Sansonetti, I plan to address the issues raised in Mr. Valladolid's brief. Your Honors, the defendants in this case were sentenced to life in prison foreclosing the possibility of rehabilitation for one defendant who was 20 years old when the events discussed at trial occurred, and for another who had moved on from his life in the Latin Kings when he was arrested. These life sentences must be reversed because they are based on a fatally flawed process and insufficient evidence. Now, with respect to the process, it was flawed at the outset when the government struck two Hispanic jurors based on their ethnicity in violation of the defendants' equal protection rights, and that alone warrants reversal of the defendants' convictions. And then at the end, the process was once again flawed when the government sought and obtained a life sentence based on the enhancement in 1963A that permits reliance on state law without following the state law requirements for such a life sentence. And that requires, at a minimum, vacating the life sentences for the defendants, which Ms. Sansonetti will discuss. And then with respect to the evidence, the evidence was flawed and does not support the convictions specifically with respect to the drug conspiracy, the drug amounts, and the murder convictions. And the reason for this is because the evidence that was presented only permits a conviction based on speculation and inferences based on the defendants' presence or associations with criminals in a gang. And that simply is not enough to fill the evidentiary gaps and requires reversal on those counts. And, Your Honors, the two areas that I wanted to focus on were the Batson argument and then also specifically the Correa murder with respect to Mr. Nieto. You know, as to the Batson argument, it seems to me that our personal experiences forms the basis for most of our biases, predilections. Must we disallow challenges made because of a juror's anti-government animus any time that bias has some connection to a person's experience as a minority? Because I fear that's what you're asking us to do. No, Your Honor, that's not what we're asking you to do. And what we're asking you to do is very specific to this case. And, in fact, we think that this case presents a unique circumstance that we actually didn't see in other cases. Where, and specifically with respect to Ms. Gonzalez, she was, we submit, struck for reasons based on her ethnicity because of her specific experience, which she mentioned and specific experiences of her family members who had been specifically affected by government policies that were actually intended to affect people of Ms. Gonzalez's ethnicity, specifically Hispanic people. And while the government states that they, and this is on page 29 of their brief, that they didn't mention Ms. Gonzalez's ethnicity when they moved to Stryker. They specifically relied on the fact that it was the fact that her family, and based on her family and her heritage, that she had been targeted, or that she felt that those people, that her family had been targeted. And that is necessarily based on her ethnicity. And that is impermissible. And so we think for that reason, that as a matter of law cannot suffice. Because to do otherwise, to permit the government, or to say that the government was proper in striking Ms. Gonzalez for those reasons, would effectively condone using, you know, potential magic words. For example, well I didn't say it was because she was Hispanic, so therefore it's not that reason. But I don't think that's what either the current law under Batson requires, or Batson requires, because what the test is, is was the juror struck for based on her ethnicity? And here we submit that's precisely what happened. And even if the court disagrees with us on the Step 2 analysis, on the Step 3 analysis, we submit there was clear error, again, based on facts specific to this case, related to the number of preemptory strikes used against Hispanic jurors versus the panel as a whole. Now while the government points out that there were, claims that the numbers are too small for this to matter, in fact, as we point out in our reply brief, in each of the cases the government cites, it was a very similar ratio of minority jurors that were stricken based on preemptory strikes compared to the non-minority jurors. And then too, we have here, there were similarly situated jurors who were not stricken, and we also have the fact that the reasons for the government striking Ms. Gonzalez and Mr. Garcia do in fact bear more heavily on Hispanics than non-Hispanics. And so, Your Honors, I see my time is short now, and so unless you have questions about that or, or the other issues we raised, I will pass it over to Ms. Sansonetti. Actually, you have another minute, 23. Oh, I believe that's my rebuttal, Your Honor. No. Well, I honestly don't remember what the talk said. Why don't you go ahead? Your second argument doesn't seem fair. Thank you, Your Honor. Now, Your Honor, with respect to the Correa murder, which, and this related to the, there was a home invasion in December 2013, where, where somebody was shot as part of the home invasion. Now, only one person who participated in that home invasion that resulted in the murder of Mr. Correa testified, and that person was Mark Cherry, who was not a Latin King, and he testified that it was not a Latin King robbery, and that's at our appendix page 2492 to 93. And that should suffice to reverse Mr. Nieto's conviction on the special verdict for the Correa murder, because there is no evidence that that murder, and, in fact, the evidence is undisputed that the murder was not, in fact, related to the Latin Kings. Well, hold on a minute there. Can I, would you mind, Ms. Schmidt, if I pause you there? Certainly, not at all, Your Honor. Okay. What I had some difficulty with, or maybe you can help me here, is the, was it an interview that was conducted of your client by the FBI or by some law enforcement? And it's in the appendix, if I found it right, it's volume one, and around page 61 or 62, your client, and I think, I think in context it shows that the question here was related to the Correa murder, right? In other words, there's not an argument that it's about some other crime or something. He talks about listening to a scanner so they could avoid being captured by the police. So that shows some involvement, at least as a lookout, does it not? And then on page 62, he says, well, he confirms, that's what I really thought in response to a question about the robbery being done to protect Latin King territory. So it's not, I understand why you're focused on the testimony of Mark Cherry, and frankly, I think you've done a good job focusing on the testimony. But there's more in the record than Mark Cherry's testimony. That's the point that I would benefit from you reacting to. Certainly, Your Honor. Now, with respect to the first point regarding Mr. Nieto listening to the police scanner, that alone does not tie this robbery to the Latin Kings. And that truly is our argument. Now, certainly, a robbery occurred and individuals were involved. But the mere fact that Mr. Nieto happened to be a Latin King and happened to be involved in this robbery does not mean that this robbery occurred. But you've got to go further, don't you? You've got to go further and deal with his next point, that the robbery was being done to protect the King territory. I do, Your Honor. Yes, I agree with that. And so for the first point, I submit that that alone is not enough. And then with respect to the second point, if you look at Mr. Nieto's testimony or his statement to the FBI that you pointed to in context, he is, it's clear when you read the Q&A, he's not really sure why the robbery happened. He's guessing. And when you and so that limited testimony about, oh, I think it was a Latin King or I think it was a Latin dragon. Mr. Martinez, who testified, he testified he wasn't in a gang. He worked at a pizzeria or a moving shop or a moving company. He didn't have drugs in his home. And so this limited testimony, I don't think, rises to the level of substantial evidence. When you put it in the context of the testimony of Mr. Martinez and also Mr. Cherry. Yeah, you have evidence, do you not, that, and I don't mean to harp on this. I think you've raised the Correa murder because of the gravity of your client's sentence and the seriousness of the overall case. And I think you're right to focus on it. But you also have testimony from the police department, do you not, that they drove some car, an SUV, to your client's home after the robbery. I mean, it's not, they don't drive off to a club or to somebody else's house. They drive to your client's home. And isn't, my only point with the question is to observe, isn't the jury allowed to connect dots between these various pieces of evidence? Your point's well taken that it's not overwhelming or anything like that. But can't the jury connect those dots? I don't think they could do that here, Your Honor. And it's for the same reason that the court held the jury couldn't in the Ledbetter case, which I know is a Sixth Circuit case. But the reality is that the evidence also that you just pointed to about, you know, going back to Mr. Nieto's house after the murder, that was, you know, that, based on the evidence, was not a plan. Clearly the robbery went wrong. And so simply going to his house, I don't think, also is evidence that it was a Latin King robbery or connected to the underlying conspiracy. And so what we're left with is like in the Ledbetter case. It's the mere fact that Mr. Nieto was a Latin King. Despite the fact that only one of the four other people involved in the robbery were Latin Kings. That I think means that this is not substantial evidence. And the jury made several inferences too far to support the conviction. Thank you very much, Ms. Schmidt. Thank you. Ms. Antonetti. May it please the court, counsel for the government. My name is Gabrielle Sancinetti. I represent Derek Valladolid on this appeal. As my co-counsel, Ms. Schmidt, stated, the sentence in this case for Mr. Valladolid and for her client is grave. It offers no hope for rehabilitation. And Mr. Valladolid was a mere 20 years old when the acts occurred in that range, from 18 to 23 years old. I would like to focus my arguments first on the 1963A sentencing enhancement applicable to RICO conspiracies, as well as the special verdicts. And I would like to note that for Mr. Valladolid, he is only challenging his conviction on the special verdicts and count two. This is important to keep in mind because where, and there are instances throughout the appeal, where a plain error review might be required, the harmless error should be considerate of the special verdict and the evidence that was presented for purposes of the special verdict, rather than for the entire underlying RICO conspiracy, which Mr. Valladolid does not challenge. Under 18 U.S.C. 1963, the government can achieve a sentencing enhancement up to life, should the racketeering activity which is predicated on the conspiracy, I'm sorry, which the conspiracy is predicated upon, includes a penalty of life imprisonment. This parenthetical in 1963A necessarily incorporates the state law where that is the racketeering predicate. And in this case, the state law was the state law of murder. In Indiana, murder is not a life sentence and only becomes so after certain procedures are employed. For example, in Indiana, a defendant would be charged with murder, and also the prosecutor would elect to notify the jury that there would be a potential sentencing enhancement at the onset of the case. After the jury made its initial determination that the defendant was guilty of murder, then in Indiana, the proceedings move forward in a bifurcated manner. What support do you have for the argument that a federal court has to follow Indiana's procedure for bifurcating proceedings on life sentences, as opposed to just a substantive law defining the crime? And relatedly, has this argument been forfeited? So to the first question, Your Honor, the argument rests on the language of 1963A, that the maximum penalty imposed for a racketeering activity is based on that racketeering activity. In Indiana, the maximum penalty is not life. And in order for the government to get a life sentence, they have to ignore that Indiana state law adheres to certain protections and procedures for a defendant can't be imposed, and a life sentence can't be imposed on a defendant. The expansive interpretation of 1963A, should the court choose it, would be that any crime whatsoever that had any potential implication for a life sentence on a racketeering activity that was based on state law, the mandatory maximum would then be raised to life, regardless of what protections the state might put in place. So as to not prescribe a life sentence for that particular criminal act. And when Congress enacted 1963A, it was concerned that there was racketeering activity where a defendant could get life in state court for murder, for example, but would be limited to a 20-year sentence in federal court. But that's the exact opposite in this case. In this case, the government has chosen to amend Indiana's protections against life sentences and choose their own procedures in order to achieve a life sentence, where Indiana has not authorized that. So my argument with respect to, you know, what gives the government, the federal government, the authority to reach beyond the state statute and create its own procedures to dictate what the maximum sentence would be for a particular crime is the simple language of the statute. The second question I believe was, was this forfeited? Your Honor, our position is that the life sentence was unlawful. So an unlawful sentence can't be forfeited. Even if a defendant is to go before a judge and waive the statutory maximum, Congress has not authorized the court to sentence the defendant to more than the statutory maximum. So a defendant cannot waive an illegal sentence. In this case, I'd like to move on to the other arguments in this, Claire, or any others on the 1963A that I have not, any other comments that I have not covered. Because I do feel that it's important to address, and I have 30 seconds, important to address the special verdict, the special verdicts in this case and the evidence. Yeah, we have a bit in 52. Okay. Okay. I'm sorry. I think we were a little confused about the time. So thank you. I'm not confused, but it's in your favor, so. Okay, yeah, so I'll take it. Thank you. Thank you, Your Honor. The special verdicts in this case are especially interesting because the evidence, particularly with respect to the murder, was so confusing and so inconsistent and so beyond what you would expect a murder conviction evidence basis to look like. And, again, I just want to note, just making it very clear that Mr. Goldlee is not challenging the RICO conspiracy, just the special verdict on murder. So in that, on the murder, the government, you know, responds to our challenges to the evidence by claiming that co-conspirator statements of confessions for the defendant is admissible and can support a conviction, and that is absolutely true. The defense doesn't quarrel with that legal principle. The problem in this case is that the statements didn't support the was in ski murder was in ski was not in a gang. He was not a two six. He was not wearing a hat tilted to the right. The facts which would connect those statements of Mr. Goldlee's, which the government calls a confession, do not support the evidence that was obtained here and particularly troubling is the testimony of Detective Detterling when the four eyewitnesses testified that the shooter of the was in ski was African American. The government sought to appease that inconsistency when Mr. Goldlee is obviously not an African American with the offhanded expert testimony of Detective Detterling. And I see I'm out of time. If the court has any further questions, I'm happy to answer them. There's better. I don't. All right. Thank you, Mr. Valen. Good morning, Your Honor, and please the court. Nathaniel Whalen here on behalf of the United States of America. And Your Honor, I'm coming in choppy. Are you hearing me OK? Yes. You're not. Thank you for me. Not yet anyway. Give me a few minutes and let's see if I can get there. Truthfully, Your Honors, I'm happy to go wherever this court would like to with this appeal. I know there are a lot of factual issues. It's probably not so much a legal appeal at this point, but unless the court has any particular area you'd like to direct me to. I really do have one. And because I've got to confess that the failure to follow Indiana's bifurcated proceeding format before imposing a life sentence for murder gives me pause. The Indiana legislature seemed to think that, excuse me, imposing a life sentence for this crime required more examination of things such as mitigating and aggravating factors, criminal history, et cetera. Is it fair for the federal court to use the substantive portions of the crime as a RICO predicate? Without the procedural safeguards Indiana had set in place? Your Honor, yes, it is. That's the system Congress has set up. The federal Congress, as this court in Murkowski, and I'm probably butchering that name, and every other court of appeals, frankly, that we've looked at, said that RICO incorporates the state's substantive elements and not its procedure. And I think the defendant is making essentially the same argument that the defendant in Murkowski made, which is this is unfair. The state couldn't punish me for this. In that case, it was a double jeopardy claim. The argument was I wouldn't be able to be subject to penalty in this case because it violates the state's double jeopardy law. And this court says, yeah, that might be so, but this is a federal crime, and we're incorporating the state's substantive law to determine whether or not you committed a federal crime. And that's consistent with the entirety of the court of appeals opinions that we cited in our brief. The question is whether we proved beyond a reasonable doubt the elements of the offense that made this defendant's subject eligible to a life sentence. And the defense keeps talking about the imposition of a sentence. The question isn't under a lane, an apprendi, and federal RICO law whether you could impose a sentence of life in state. The question is, are you eligible for a life sentence? And we complied with those procedures, and the defendant absolutely forfeited this issue, Your Honor, by not suggesting any of the procedures, not arguing that the jury instructions were wrong. In fact, the defense proposed these instructions along with the government that made him eligible for a life sentence. And there is no case law that I found, and certainly the defense has not cited any, that says the federal courts adopt the state's sentencing procedures. Again, to the contrary, the federal law is uniform across the board. We do not adopt the state's sentencing procedures. We do not adopt state evidentiary law. It does seem that Indiana's bifurcated process has substantive aspects within it. For example, during the sentencing phase of the bifurcated proceeding, the defendant can present evidence of mitigating factors. And, of course, I've also wondered about it as a due process problem. Your Honor, I guess the defense has never raised a due process argument that I'm aware of. So I think that those are my reasons. Yeah, well, and, Your Honor, if you look at subsection A of Indiana Code 3550-29, which is our applicable, that's the statute that makes it a murder subject to life as opposed to the 65-year maximum. Subsection A says that if the government, the state government in that instance, wants to increase the defendant to a life sentence, the jury has to find, the state has to charge, an aggravating circumstance. And then if you continue down the statute, subsection D says the jury has to find that aggravating circumstance. And certainly were this defendant charged in Indiana court, before he could have a life sentence imposed, he could present mitigating evidence. But that's a question of imposition as opposed to whether he's subject to the life sentence. And Congress talks about, in the federal RICO statute, whether he could have a life sentence. It's the question of the availability of the sentence as opposed to whether it would be imposed in the state court. I hope I've addressed all the court's questions on that issue. I'm happy to address any others, obviously. Unless the court has any questions on those, I guess I'd quickly move to the Batson argument. When you do, if you could help us understand how we should tease apart this difference between a political opinion and a political opinion that stems from the race or ethnicity of the juror. Can a preemptory strike based on the latter ever be the subject of a Batson challenge? The latter being a political opinion based on the race of a juror, Your Honor? The race or ethnicity, yeah. Yeah, Your Honor, I would say that the way this court deals with that claim is to read the Supreme Court's opinion in Hernandez. The defense made the same argument there that they're making here, which is, yes, you might be saying that you're striking the potential jurors based on the fact that they speak Spanish. But that really just means you're striking them because they're Hispanic. And the Supreme Court said, no, no, no, there's a difference. One is based on a non-Batson problematic analysis, meaning it's the question of whether or not you will accept the translator's translation is true. Supreme Court said that is a non-race based strike. And it upheld the district courts or probably a state court in that case. I apologize. The state court's finding in that case that there was a race neutral reason for the strike. And, Your Honors, I mean, to the point, the argument the defense has made is that we struck Miss Gonzalez because of her immigration experience. Your Honor, that's not right. If you read page 192 of the transcript, I'm quoting here. Regarding Miss Gonzalez, she expressed distaste and dismay. And I don't know if I would say anger, but the current sort of tenor in the country as far as immigration goes. That isn't based on the fact that she is an immigrant. It's based on her policy disagreement with the then federal government. And the government would have struck in a Hispanic juror. It would have struck in a Caucasian juror. It would have struck in an African-American juror for the exact same reason. Because the concern is that this juror so dislikes the federal government's policy that they are going to hold it against the prosecutor in the Northern District of Indiana and vote to acquit. And that's a race neutral reason. And that's the reason that the AUSA offered at the time of sentencing. I'm sorry, not sentencing. I apologize. At the time of the voir dire. And the district court at step three accepted that as a race neutral reason. And the district court said, you know, Judge Simon goes on to say that he thought this was almost rising to the level of cause. This particular juror's distaste for the federal government rises almost to the level of cause. And the record shows the AUSA's concern was well founded because if you begin with the opening statements, Mr. Valadola's counsel gets up and he starts talking about how the government, and this is page 356, the federal government has an amazing power to decide who to charge, who to deport. Mr. Nieto's counsel gets up and says, government agencies, and this is on page 359, government agencies need to justify their own existence. We hear it on Twitter feeds and daily comments from none other than the president of the Department of Justice about witch hunts and hoaxes. I believe that the defense and the government is concerned about this was going to try to make this trial an implication on the then executive policy as it regards to immigration. And that is why we struck this jury in this case. It has nothing to do with the fact that she's an immigrant. It has to do with her policy. Your honors, I'm happy to keep talking about that. I'm happy to go anywhere the court wants. I think Judge Scudder, in terms of the CREA murder, I do think the jury could have found beyond reasonable doubt that it was in furtherance of a drug rip gone bad and that drugs were going to be kicked back to the Latin Kings. But I think you're right. The jury also could have found that it was pursuant to a gang activity. And I don't think if you look at the testimony you're citing, and that was exhibit 11B, it's not really ambiguous. The officers said they were going to do something gang related. You were going to listen to the scanner for them so they could avoid being captured by the police. And Nieto says, essentially, yep, there was a dragon that moved into the hood. They say, so you think they were protecting Latin King territory? Nieto says, well, that's what I really thought. Any juror could have found beyond reasonable doubt that he set up this murder or he aided and abetted this murder to protect gang territory, which was one of the rules of the Latin Kings. If there's a rival in the area, you got to kick them out. You got to shoot them one way or the other. Why was it necessary to have such detailed and graphic testimony of the Correa murder and home invasion? Neither of the defendants disputed that the home invasion occurred. Wouldn't it have been sufficient to present only the evidence that linked Mr. Nieto to the home invasion? Your Honor, neither of the defendants stipulated that the murder occurred. I think we had to prove a murder to increase the defendant's sentence to life. And so we had to prove up the murder and the jury had to make that special finding. If the defendants had come to us and said, yeah, we'll stipulate that Correa was murdered pursuant to this drug rip gone bad. That's a different case. And I think that's a big issue with this appeal as a whole, Your Honor. The defense say, well, it was cumulative evidence. And, you know, there was a ton of evidence that these defendants associated with the Latin Kings. Respectfully, up until the time Mr. Valadola takes off his shirt in front of the jury to show them he does not have gang tattoos. Up to and including that time, each defendant vigorously denied they were part of the Latin Kings. That was an issue throughout the entire case. They said, I am not a Latin King member. And if they've been willing to stipulate to that, this case would have gone differently. But they didn't. So we had to prove there was a Latin King conspiracy. We had to prove these defendants were associated with it. And so we introduced videos, for example, where they are with Latin King members in the neighborhood produced by one of the indicted co-conspirators. We had to prove this case. And it was a long case and it was a hard fought case. And I think this court should also take note in the number of arguments the defense are trying to raise on plain error here. Defense counsel did, I think, an admirable job down below, and they were not shy to objecting every step along the way. I think if you look at the closing arguments, for example, in the government's rebuttal, Mr. Valadola's counsel objected two times within the first three times within the first two pages. But the arguments that they're raising as it relates to closing argument are things that were not objected to. And same thing with the evidence. This was stuff that wasn't objected to down below. And they can't try the case based on that. Mr. Whalen, let me. The point that you made about the evidence, the efforts or the lengths the government went to to put on Latin King evidence. I did. I did catch that in preparing one of the concerns that I had in the context of that. What is with respect to the drug weight evidence in particular? And I don't think there's any question in this record that the Latin Kings, as in Rico language is an enterprise here, and that the Latin Kings make money in part by trafficking in narcotics. How do you tie, though, the drug quantities that in the end, through the special verdict, were attributed to these particular defendants? What evidence do you look at in your mind? Your Honor, I think it's different kind of a guilt by association question. That's the that's the one count that I have a little bit of concern on. Well, first of all, your honors, I do think both of these are reviewed for a manifest miscarriage of justice because the defense did not object or didn't renew their motion for rule twenty nine at the close of their evidence. Oh, as it relates to this. Well, finish. I'm sorry. I apologize. No, I don't. It's not. I can come back to my point. Your Honor, may I go on? Your Honor, it's not a guilt by association attribution. So there are multiple individuals who testified about the fact that these defendants were dealing cocaine. Mr. Sanchez, Roberts, Vargas, Brown, canceled manual and Monica, you know, all testified that Robert was dealing drugs. I'm happy to give page sites to similar cast of characters testified that Mr. Valadol is dealing drugs in terms of the actual quantity itself. You know, I think the easiest way for this court to get to the quantity as it relates to Mr. Nieto is to look at the fact that Mr. Vargas says on page ten seventy nine, he's getting his cocaine from the cartel. Danny Ruiz on page ten thirty nine is the chief enforcer for Indiana, and he's moving about a half a kilogram per week down to Indiana. There are four chapters of Indiana and that's on page ten seventy four. And Danny Ruiz says he's giving drugs to Nieto. That's on page ten eighty six. I think a juror could reasonably find you take half a kilogram of cocaine a week. Divided into eight different chapters. So that's an eighth of a kilogram. All it takes is eight weeks then to get up to one kilogram. And when Mr. Nieto is a regional enforcer at this time, he's a regional enforcer from 2008 going forward. Double check and make sure I got that right. I'm sorry. 2009 going forward. So all you really need is what that 40 weeks. The jury needs to find 40 weeks when he was under Vargas and all this cocaine is fumbling through him. I think you could also look at Mr. Sanchez's testimony about how much Mr. Nieto is feeling. And we cited that in our brief. In terms of I'm happy to keep going on Nieto, but I think that gets the point there in and of itself. I think when we're talking about Mr. Valadolid, it's not just the amount of drugs that he himself sold. It's the amount of drugs he conspired to sell. And when you are a leader of a chapter, as he was from 2010 to 2012, a jury could reasonably find when you're sitting in these meetings discussing who's selling drugs, that you are conspiring with your underlings to sell the drugs you're giving them. And Vargas testified that the drugs go from the chapter down to the soldiers. So and we cite this in our brief, your honors, but briefly, Mr. Valadolid or Claudio Martinez during that time is selling 10 ounces of cocaine. And that's pages 14, 19 to 22. Sean Pena is dealing three and a half ounces weekly. That's 1422 to 25. Tony is dealing one and a half ounces weekly. And that's 1425 to 1427. And Alden Perez is dealing one ounce weekly. And that's page 1172 and 1427. And your honor, I did the math this morning. If you project those out for one year, just one year alone, that gets you to 11 kilograms being dealt by those in Mr. Valadolid's 148th chapter. Well, he is the reach outside the chapter. And the jury could easily find that amount attributable to him as part of his conspiracy. Okay. Mr. Nieto says that he joined Mr. Valadolid's rule 29 motion at the close of evidence, thus preserving every objection and wasn't required to renew it after the verdict. Do you agree? No, I don't agree, your honor. Mr. Nieto joined Mr. Valadolid's motion at the close of the government's evidence. But then if your honor goes to, sorry, a lot of notes here. If your honor goes to page 2557, Mr. Nieto puts on a case in chief. It's admittedly not a large case in chief, but it's a case in chief. He then relies on that evidence on page 2716 at the closing arguments to try to impeach Mr. Manuel. He did not join any rule 29 motion after he presented evidence. And as the court's well aware, you have to rule, you have to, I'm sorry, move under rule 29, both at the close of the government's case in chief and after your case in chief. Mr. Walen, I'm sorry to interrupt you. Those page numbers may be important. What are they again? I'm sorry, your honor. It should be in our brief, but to the extent they aren't. Page 2557 is when Nieto puts on his case in chief. He admits a state court docket about an individual who Mr. Manuel had said had been involved in a shooting. And admittedly, it's not a big case in chief. But I don't know that this court's right. I have not found any case law ever saying this court's drawn a distinction between a big case in chief and a small case in chief for the defendant. And this wasn't some ancillary point on page 2716 of closing arguments. He relies on this evidence to try to argue the government's case was unbelievable. And I guess to the extent the court has any concerns, page 1602 is when they're talking about the individual involved in that case. And that's, I think his first name is Mike, but it's Mr. Flanagan. And your honors, I guess to the extent that it would be useful for the court, I'm happy to submit a supplemental filing with those case sites. I know I'm rattling off a lot of pages. I'm sorry, page sites. I know I'm rattling off a lot of pages, and I apologize for that. You were asked to do that. Judge Scudder, would you? Sure. I mean, sure. So long as your adversary has an opportunity to respond, you know, and I know it's disputed in the briefs. I'm grateful that Judge Rovner has asked the question. So if you would take 14 days, and then if you, Ms. Schmidt, if you would take 14 days. To be clear, your honor, we believe we prevail under any standard, but I certainly want to aid the court in figuring out what's the right standard to review. Thank you. Now, Ms. Schmidt, you have a minute or less.  Thank you, your honor. I'll be brief. Now, with respect to Judge Scudder's questions on the drug conspiracy, and specifically the amounts, now, it was telling what the government pointed to with respect to the conspiracy was people testified that Mr. Dieto bought drugs and that he sold drugs. But that doesn't establish a drug conspiracy, which is what the government sought. That may well establish drug distribution, but that wasn't the charge here. I think the Johnson case, which we cite in our brief, is clear. A drug purchaser does not enter into a conspiracy with his supplier by reselling drugs to his own customer. The Vargas testimony that Mr. Whalen pointed to was Mr. Vargas saying that Mr. Ruiz said that he sold drugs to Mr. Nieto. There was testimony that Mr. Vargas fronted drugs to Mr. Ruiz, but there was no testimony that that is what, that Mr. Ruiz fronted to Mr. Nieto. There is no testimony about what Mr. Nieto did with the drugs supposedly provided by Mr. Ruiz. And now, the government's argument, nonetheless, is that, well, the jury could have simply inferred that this amount of drugs from Mr. Ruiz must have gone to Mr. Nieto, and that therefore equals the amounts that the jury found. But that is not substantial evidence, and that is not supported. And I would just refer to the court. We describe this in more detail as far as why the evidence that Mr. Whalen recited in his argument is not supported on pages, I think, 22 and 23 of our reply brief with respect to the amounts. Thank you, Your Honors. Thank you. Ms. Henson. Thank you, Judge Rovner. There are a couple of points that I would like to address that the government brought up. And the first is that the process for Indiana, once the government chose to go for the life sentence, the government was full on able to ask the jury to find the murder and ask for the special instruction and limit the mandatory maximum to 65 years as Indiana law dictated. I believe the Seventh Circuit has indicated that 1963A isn't limited to just the life sentence. It is referencing whatever the state law sentence is. So I would like to suggest also that the court take a look at the actual Indiana proceeding, which combines the aggravating factor and the mitigation that the defense can present. In addition, I wanted to touch on the prejudicial. Is that an apprendi-based argument? How would you characterize that argument as a legal matter? Well, Judge, I think it's just a simple statutory construction. I don't think it gets any more complicated than that. The 1963A references the mandatory maximum for state law. And if that's life, then the state law sentence applies. In Indiana, it's 65 years. If the government wants to move forward and ignore Indiana law and create its own procedures for how to get to a life sentence, I don't know how this court reconciles that. I don't know what limitations the government then has on obtaining a life sentence on a state law predicate where life sentence is a potential regardless of the facts or the procedures that the state has elected to employ. You're characterizing it as the imposition of a life sentence under Indiana law. You can disagree with this, but to my mind, it's a federal racketeering sentence. It's a RICO sentence. And the United States Congress, for better or worse, has said if the state reference point for the predicate act maximum is life imprisonment, that shall be the federal sentence that's imposed. That shall be the sentence that accompanies a conviction that way. And in this case, that state law sentence was 65 years. I don't know how the government gets to a life sentence by ignoring what Indiana has set in place, which provides a procedural barrier to a life sentence. I see that I'm out of time, and I apologize if I haven't fully answered your question. No, thank you very much. Do you have a further question, Judge Scoder? I don't. All right. Well, here. I believe, Ms. Schmidt, that you were court appointed, correct? Yes, Your Honor. But I'm not certain about you, Ms. Cincinnati. Were you court appointed as well? Yes, Your Honor, I was. Well, you both certainly have the thanks of this court for the work that you have put forth on behalf of these men. Mr. Whalen, as always, you also have the thanks of this court for the work that you do for the government. Thank you, Your Honor. Thank you, Your Honor. The case will be taken under advisement.